UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHELLE GILL,

                Plaintiff,                    Case No. 05-70739

vs.

                                      HONORABLE DENISE PAGE HOOD

JO ANNE B. BARNHART,               HONORABLE STEVEN D. PEPE

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____/

**REPORT AND RECOMMENDATION**

## I.    BACKGROUND

Michele Gill brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. Both parties have filed motions for summary judgment which have been referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, IT IS RECOMMENDED that Plaintiff's motion for summary judgment be DENIED and Defendant's motion for summary judgment be GRANTED.

### A.    Procedural History

Plaintiff originally filed an application for DIB on March 22, 2002, claiming disability since June 18, 2001, due to torn left rotator cuff (R. 56-58, 71). Plaintiff's claim was denied on July 27, 2004, after a May 14, 2004, hearing by Administrative Law Judge ("ALJ") Douglas N. Jones (R. 15-24). Plaintiff appealed and the Appeals Councils declined review (R. 5-8). Plaintiff's date last insured ("DLI") was July 27, 2004 (R. 24).

B.    **Background Facts**

1.    ***Plaintiff's Application***

In her DIB application Plaintiff stated that she had worked on the General Motors production line for the last 15 years in a position which required frequently lifting 15 pounds, walking/ standing/crawling for 6 hours per day, sitting 1 hour per day, and handling/grabbing/grasping big objects and writing/typing/handling small objects 6 hours per day (R. 72).  She completed 2 years of college but no special job training, trade or vocational school (R. 77).  Her disability stemmed from a torn left rotator cuff, and she had not worked since June 18, 2001, because her employer was unable to find a job "in line" with her restriction" (R. 71).  The restrictions she noted were: no lifting over 5 pounds, limited pushing and pulling with left arm (less than 5 pounds) and no work at or above shoulder level.[1]

Her *Pain Questionnaire* answers reveal that her problems began in November 1998 when she injured her left shoulder on the job (R. 91-92).  After treatment in 1998 her shoulder got better (R. 92), but she described the current status as worse, as she now had to limit movement, restrict lifting to less than 5 pounds and work below shoulder level (R. 91).  She also experienced numbness in the left arm and hand when she slept.

She experienced pain each day in varying degrees (R. 91).  Pain was exacerbated by heavy lifting, repetitive movement and overhead work.  Heat, rest, Tylenol and Ben Gay lessened the pain (R. 91, 93).  She did not experience side effects from the medication (R. 93).

Her condition did not effect her ability to walk, stand, sit or use her hands (R. 93-94).  She

---

[1]In her application Plaintiff also indicated that she had sought treatment by a doctor due to physical limitations in her ability to work, but had not sought treatment for any emotional or mental problems that could limit her ability to work (R. 73).

had no restrictions other than those described above (R. 94).

In her *Daily Activities* form she indicated that on a typical day she would bathe, eat, wash dishes, do laundry and watch television (R. 96). Her hobbies include walking, reading and sewing, and she liked to attend church and shop. She got along well with other people and enjoyed counseling young people (R. 97). She had close relationships and like to talk on the telephone, go out to eat, "visit the sick at home or in the hospital", visit friends in and out of town. Yet, she did complain that she was not able to "work out" as she had been able in the past.

She drove daily, though hand over hand movements caused her pain (R. 98). She cooked and did housework, but had trouble manipulating heavy objects. She did yard work, but had to use her right shoulder more often than her left (R. 98) and sometimes required assistance with heavy tasks (R. 100). She slept 8-10 hours per night (R.99).

        **2.**      ***Plaintiff's Hearing Testimony***

Plaintiff was born on January 20, 1950, and graduated from high school (R. 258). She lived with her husband, who was retired, and her 24 year old son (R. 257-58). Her last employment was with General Motors Buick in Flint (R. 259). She stopped working on June 18, 2001, because she of pain in her shoulders, hands and elbows. She then attempted to work at Michigan Sleep Diagnostics, but quit the job after her first shift (R. 260). The shift was 7:00 p.m. until 7:00 a.m. and she found it too stressful to stay up during the evening hours and worried about the safety of being in the building alone.

Her monthly income at the time of the hearing was $2,396 in Worker's Compensation benefits and $993 from her General Motors retirement (R. 261). She also received health insurance through General Motors.

She had a current driver's license and she drove as frequently as seven times each week, going to the store and to church (R. 262).  She had made one out of state trip during the past two years, driving to Augusta, Georgia with her husband for a family reunion (R. 262-63).

She had not had surgery on either her hands or her shoulders.  Abdullah Raffee, M.D., was her primary care physician, Dr. Levin was her treating physician with regard to her shoulder injury, and she saw Dr. Beird regarding the possibility of having surgery on her hands.  She also consulted with Dr. Blasier for her shoulder and she currently met with Dr. Kim once every six weeks for her "psychological problems".  Dr. Kim did not do any counseling and just saw her for medication review appointments (R. 265).

Her husband did the yardwork at their home (R. 267).  She performed some housework, but in moderation.  She could not perform housework for more than one hour at a time without taking a rest for 30  minutes to 1 hour or 2.  She had trouble sleeping and woke up several times each night due to pain or numbness.  She took an average of two naps each day for 15 minutes to 2 hours each (R. 268).  She had  no limitations sitting and could stand and walk in moderation.  She estimated that she could walk ½ hour to 45 minutes.  She could stand for 45 minutes to an hour.  She could lift a gallon of milk without any problem, but heavier objects she would have to lift with her right hand. She had difficulties pushing and pulling and reaching overhead, mainly on the left side (R. 269-70). She often required assistance opening items such as lids on jars, and experienced hand cramping when attempting to button buttons or zip zippers (R. 270).  She could write for 20 minutes.  She could complete grooming tasks, but sometimes needed to rest her arms mid-task (R. 270-71).  Her husband did most of the cooking.  He had done so for most of their relationship, but it had become necessary now that because she either could not do it or it would take to long (R. 271).  She could

type on the computer for 15 minutes.  She was no longer wearing splints for her carpal tunnel syndrome and was doing exercises  to keep the area flexible (R. 266-67).

She had worked for General Motors (GM) from 1978 until she stopped working in June 2001 (R. 272).  During a lay-off from GM, she had worked as a financial aid officer for the Programming and Systems Institute (R. 272-73).  In this clerical job, she did filing, answered the telephone, assisted students in filling out grant request forms and loan applications, and talked to parents about available financial aid (R. 273).  She performed this job between 1989 and 1993 (R. 274).  The position  required little lifting but some  walking to the student's classrooms to inform them that their financial aid checks had arrived (R. 274). .

### 3.   *Medical Evidence*

On September 8, 1997, Plaintiff visited Jae C. Kim, M.D., due to anxiety attacks following a car accident wherein she was hit by a drunk driver (R. 173).  Dr. Kim prescribed Prozac and Xanax ®. 138).  Originally Plaintiff refused to take the medication, but she within a month she began taking the medications regularly and the anxiety attacks were controlled, though Plaintiff still showed signs of anxiety and depression (R. 170-72).  Plaintiff returned to work in November 1997 and her condition fluctuated, with periods of anxiety and poor concentration continuing to emerge (R. 169-70).  By April 29, 1998, Plaintiff's anxiety attacks were controlled and she was doing "o.k." ®. 166).  Continued treatment notes from this time until February 10, 2003, indicate that Plaintiff's anxiety attacks were controlled with medication (R. 144-65).

A *Personnel  Administration - Medical Form*  from General Motors indicates that Plaintiff was to be on restrictions of no lifting over 5 pounds or pushing and pulling over 5 pounds with her left arm, and no work at or above shoulder level until September 6, 2002 (R. 116).

On June 12, 2002, Richard J. Kovan, M.D., examined Plaintiff to make a disability determination, without the benefit of seeing a left shoulder MRI that Plaintiff explained had been taken and revealed a torn rotator cuff (R. 117-118). Plaintiff reported that after the MRI results surgery had been recommended but that she refused (R. 117). Dr. Kovan found Plaintiff to have full active range of motion in the upper right extremity with limited range of motion in her left shoulder flexion and abduction to 90 degrees, with full internal rotation. Muscle strength reflexes and sensation tests were normal. Strength was normal but somewhat weak. There was no evidence of muscle atrophy, deformity, erythema, edema or effusion of the left shoulder compared to the right (R. 117-18). Dr. Kovan recommended that the decreased range of motion be correlated with MRI studies to determine if the tear was partial or full (R. 118).

Robert H. Digby, M.D., completed the *Physical Residual Functional Capacity Assessment* on July 7, 2002, (R. 123-130). His primary diagnosis was a torn left rotator cuff (R. 123) and he assessed Plaintiff to have the RFC to occasionally lift 20 pounds, frequently lift 10 pounds and stand, walk or sit 6 hours per 8 hour work day, with occasional crawling or climbing ladders/ropes/scaffolds and frequent climbing of ramps or stairs and frequent balancing, stooping, kneeling and crouching and no exposure to hazards (R. 124-25, 127). This RFC assessment also limited pushing and pulling using her left arm to occasional overhead reaching and frequent handling (R. 124 citing 126). Dr. Digby indicated that the RFC was based upon Plaintiff's allegation that her rotator cuff was torn and the physiatric evaluation showing reduced active range of motion in her left shoulder (R. 124). He also indicated that her symptoms of pain lifting over 5 pounds and limited pushing and pulling with her left arm were credible in light of her allegation of a torn rotator cuff (R. 128).

An August 29, 2002, electromyogram report revealed carpal tunnel syndrome, greater on the left than right, and cubital tunnel syndrome[2] on the left (R. 131).

On December 2, 2002, Plaintiff was referred to Ralph B. Blasier, M.D., by Dr. Levin for a consultation regarding her left shoulder pain (R. 188-89). Plaintiff reported that she injured her left shoulder "some years ago" but could not remember the date (R. 188). The pain had been resolved with physical therapy, but then she re-injured the left shoulder a year later on the job. She was put on restrictions by "plant medical" and worked with restrictions for one year, until June 18, 2001. She further reported that during this time she received physical therapy, which helped "some", and obtained an MRI which revealed a torn left rotator cuff. After June 18, 2001, restricted work was no longer available and she has been on Worker's Compensation ever since. She often had left shoulder pain, but not constantly (R. 189). The pain was moderate if she kept the arm below shoulder level. The pain woke her during the night approximately twice per week, more if she laid on it. Dr. Blasier determined that the previous left shoulder MRI which reported a rotator cuff tear actually showed "degenerative cysts in the head of the left shoulder" but he was not convinced that the report confirmed a tear. Physical examination revealed normal cervical range of motion and tenderness and decreased range of motion in her left shoulder (R. 189-90). X-rays revealed degenerative cysts in both shoulder heads and AC arthrosis in the left (R. 190). Dr. Blasier recommended physical therapy and ordered a new left shoulder MRI so that he could positively determine if there was a left rotator cuff tear. He also completed a form temporarily disabling Plaintiff from work for approximately 4 months (R. 187).

---

[2]Nerve compression problems behind the elbow are called cubital tunnel syndrome. The ulnar nerve passes through the cubital tunnel which is a bony passageway.

A February 7, 2003, left shoulder MRI revealed normal rotator cuff muscles, and produced an impression of likely tendinopathy, degenerative changes in the acromioclacicular (AC) joint and subchondral cysts in the humeral head of the supraspinatus tendon (R. 186).

On March 11, 2003, Plaintiff reported that physical therapy had helped her "a lot" and that she was having pain only occasionally.  She indicated that she was not working because her "company doctor" had placed her on restrictions of "no repetitive working and no lifting more than 5 pounds"  and there was no work for her within those restrictions (R. 185).  She was seeking medical retirement. Dr. Blasier interpreted the left shoulder MRI[3] as showing AC joint degenerative changes with a cyst in the head of greater tuberosity and increased signal in the supraspinatus, but no tear.  Dr. Blasier determined that surgery would not be required, prescribed additional physical therapy and asked that what he thought would be her final exam be scheduled for 6 to 8 weeks.  He saw no "reason to contemplate changing the restrictions that were given to her by her factory doctor".     On April 28, 2003, Ralph Blasier, M.D., reported that Plaintiff had a "complete resolution of shoulder symptoms at this point"and had been approved for medical retirement (R. 184).  He recommended that she continue her home exercise program for her shoulder, and noted that she was still treating with Dr. Beard (sic) for carpal tunnel syndrome.

On May 6, 2003, Thomas H. Beird, M.D., examined Plaintiff for a consultation regarding her carpal and cubital tunnel syndrome symptoms (R. 191-93).  Plaintiff reported increasing numbness, tingling and prickling pain in her hands and sometimes into her upper extremity, with

---

[3]The record states that Dr. Blasier interpreted a July 3, 2003, left shoulder MRI.  Yet this is clearly impossible given the date of the record, March 11, 2003.  Therefore, the undersigned assumes Dr. Blasier was interpreting the February 7, 2003, MRI he had ordered, especially because the two MRI results are identical.

clumsiness, weakness and nightly paresthesias ®. 191).  Physical examination revealed that her

hands were moderately swollen, with full range of motion that was somewhat hastened by the

swelling.  Tinel's and Phalen's tests were positive in the wrists bilaterally, and there was evidence

of thenar atrophy[4] bilaterally, worse on the left.  Tinel's sign was positive on the left cubital region

as well, with no hypothenar atrophy or intrinsic wasting.  He noted that an EMG had confirmed left

cubital syndrome.  He suggested surgery to prevent the condition becoming permanent but Plaintiff

refused.

Plaintiff saw Dr. Levin on June 2, 2003, and reported having been seen by Dr. Beird who

recommended surgery on both hands to relieve her carpal tunnel and cubital tunnel syndrome (R.

180).  She indicated that Dr. Blasier performed physical therapy and had recommended a home

program for her shoulder.  Upon physical examination Dr. Levin found Plaintiff to have cervical

paraspinal muscle spasm and bilateral thenar[5] weakness.  Tinel's sign was positive at both wrists and

the left elbow, with hypothenar weakness on the left wrist.  His diagnosis was carpal tunnel

syndrome, cubital tunnel syndrome and rotator cuff pathology.  He recommended wrist splints, and

asked her to consider the surgery Dr. Beird suggested.

On January 21, 2004, Dr. Levin conducted a follow up examination and reported positive

Tinel's and Phalen's signs in the wrists bilaterally and positive Phalen's test in the left elbow (R.

239).  She had weakness and limitation of abduction in the left shoulder.  He diagnosed carpal and

cubital tunnel syndrome and left rotator cuff pathology, renewed her prescriptions and added a

---

[4]Thenar atrophy means that muscles that control thumb abduction and opposition have
become weak and/or atrophied.

[5]The thenar area is the inner surface of the hand from the wrist to the base of the fingers

prescription for Tylenol #3.  She was to return in six months.

On March 18, 2004, Dr. Kim reported that Plaintiff had continued to maintain her improved condition, her anxiety attacks were better controlled and she visited a therapist every two weeks (R. 242).  On April 29, 2004, Dr. Kim reported that Plaintiff had been doing "okay", her anxiety attacks were controlled and she was having no medication side effects.

### 4.  *Vocational Evidence*

ALJ Jones asked VE Pauline McEachin to classify Ms. Gill's past work as a financial aid officer based on the description of the job provided by Plaintiff at the hearing (R. 275).  VE McEachin indicated that the position would be considered general office clerk at the light and unskilled level (R. 276).  ALJ Jones then asked her to consider a hypothetical person of Plaintiff's age, with a high school diploma and Plaintiff's work experience, who was limited to performing light work with: frequent lifting of five pounds, occasional lifting of fifteen pounds, occasional pushing and pulling with arms, no crawling or climbing ladders, frequent forward reaching with her (non-dominant) left arm, occasional overhead reaching with left arm and no tasks involving forceful or sustained gripping and grasping, constant repetitive wrist movement or use of vibrating tools.  ALJ Jones asked whether this hypothetical person be able to perform Plaintiff's past work as she actually performed it or as such a job might exist in the national economy.  VE McEachin responded that such a person could perform Plaintiff's past job as a general office clerk, either as Plaintiff had described it, or as that job is generally performed in the national economy (R. 277).  The VE also confirmed that if the weight restriction were reduced to 5 pounds occasionally and 10, instead of 15, pounds occasionally, that change would not her answer (R. 278).

VE McEachin also testified that Plaintiff could not return to her past relevant job as an

automobile worker due to the requirement of forceful gripping and grasping, use of vibrating tools and repetitive use of the wrist.

Upon ALJ Jones inquiry, VE McEachin also listed the following alternative light unskilled jobs the hypothetical person could perform: 1,700 information clerk, 2,200 visual inspector, and 6,000 security guard positions.

VE McEachin indicated that the addition of restrictions for (a) exposure to unprotected heights or hazardous, uncovered moving machinery and (b) lifting 10 pounds occasionally and 5 pounds frequently, would not change the hypothetical person's ability to perform Plaintiff's past work or the identified available positions (R. 277-78).  The addition of a requirement of 2 rest periods of 30 minutes each would be a special accommodation and would preclude all unskilled work (R. 278-79).  The addition of a restriction for only occasional contact with the public would eliminate the availability of the past work and the information clerk positions and reduce the security guard positions to 2,000 (R. 279).  The addition of a restriction for only occasional gripping and grasping and wrist movements would eliminate Plaintiff's past work, leaving the alternative positions unchanged (R. 280-81).

### 5. *The ALJ's Decision*

ALJ Jones found that Plaintiff met the disability insured requirements of the Act on her alleged onset date, through July 27, 2004 (R. 23).

The medical evidence documented the presence of impairments "best described as: degenerative joint disease of the left shoulder, bilateral carpal tunnel syndrome, cubital tunnel syndrome on the left, hypertension, obesity, status post hysterectomy (5/96), post menopausal syndrome, an adjustment disorder with depressed and anxious moods, and an anxiety disorder with

11

panic attacks" (R. 21). The impairments were collectively severe, within the meaning of the Regulations, but not sufficiently severe to meet or equal the requirements of any impairment listed in Appendix 1, Subpart P, of Regulations No. 4 (20 C.F.R. 404 1520(d)) (the "Listing") (R. 21, 23).

Plaintiff had the RFC to perform light work as defined by 20 C.F.R. § 404.1567 that involves lifting and carrying only 5 pounds frequently (up to 66 %) and 10 pounds occasionally (up to 33 %), no crawling, no climbing ladders, frequent but not constant reaching forward with the left arm, occasional reaching overhead with the left arm, no forceful or sustained gripping or grasping, no constant repetitive wrist movements, and no vibrating hand tools (R. 23).

Plaintiff's allegations regarding her limitations were not totally credible because they were inconsistent with the objective medical evidence, absence of more aggressive treatment and Plaintiff's daily activities (R. 22). He noted that she had refused to obtain the suggested carpal tunnel surgery, had a documented "complete resolution" in her left shoulder symptoms and that her psychological symptoms were controlled, and that there was no medical need or recommendation for extensive daytime napping.

Plaintiff's past work consisted of jobs as an automobile assembler and general office clerk (R. 22). VE McEachin described these jobs as unskilled in nature and light exertion (R. 22, referring to VE McEachin's testimony, Plaintiff's testimony and the work history forms completed by Plaintiff with her DIB application). Plaintiff was able to perform her past work as a general office clerk and was therefore not disabled (R. 23).

## II.    ANALYSIS

### A.    Standards Of Review

In adopting federal court review of Social Security administrative decisions, Congress

limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[6] A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

**B.   Factual Analysis**

Plaintiff raises three challenges to the Commissioner's decision: (1) the ALJ erred in improperly delegating his analysis of Plaintiff's ability to perform her past work to VE McEachin; (2) the ALJ failed to properly consider the opinions of Plaintiff's treating physicians; and (3) the

---

[6] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

hypothetical posed to VE McEachin failed to accurately portray Plaintiff's impairments.

### 1. *Proper Use of Vocational Expert Testimony at Step 4*

Plaintiff argues that ALJ Jones failed to properly evaluate her ability to perform her past work as a general office clerk because he based his decision on VE McEachin's testimony regarding (a) the skill and exertional classification for the job, and (b) whether a hypothetical person with Plaintiff's RFC could perform the job.

The Social Security Rulings state that a claimant's testimony "regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work". S.S.R. 82-62. Determination of whether a claimant can still perform their past work requires more investigation:

> .... Determination of the claimant's ability to do [past work] requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the Dictionary of Occupational Titles, etc., on the requirements of the work as generally performed in the economy.
> ....

*Id*.

Further, 20 C.F.R. § 404.1560(B)(2) provides for the use of vocational experts in determining whether a claimant is capable of performing their past work:

> ...a vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy.

20 CFR § 404.1560(B)(2).

14

In the present matter ALJ Jones asked VE McEachin to consider Plaintiff's testimony regarding the job requirements for her past work as a general office clerk and then provide testimony regarding the skill and exertional levels for the job and whether a hypothetical person with Plaintiff's RFC would be capable of performing the job (R. 275-76).  As stated above, VE McEachin characterized the job as unskilled, light work and testified that the hypothetical person would be able to perform this work (R. 276-77).

In determining that Plaintiff was able to perform her past relevant work, ALJ Jones stated that "[t]he vocational expert, consistently with the Dictionary of Occupational Titles (DOT), described [Plaintiff's past work] both as unskilled in nature and required a light level of exertion" (R. 22).  He then referred the reader to the work history forms completed by Plaintiff, Plaintiff's testimony and the testimony of VE McEachin.  He went on to say that "[t]he claimant's residual functional capacity is consistent wither (sic) past relevant work as a general office clerk (testimony of vocational expert)".

Plaintiff's testimony regarding the requirements of the general office clerk position were sufficient for determining the skill level, the exertional demands and non-exertional demands of such work.  This case is not on point with those cited by Plaintiff where a vocational expert is called upon to provide testimony regarding a claimant's past work where only a list of the claimant's past jobs is provided to the expert and the court is then left to imagine what the expert believed the job requirements were.  In this matter Plaintiff herself described the demands of the job, and ALJ Jones was free to rely on vocational expert testimony regarding how the job Plaintiff described should be characterized and whether a person with Plaintiff's RFC could still perform it.

### 2.   *Proper Use of Treating Physician's Opinions*

Plaintiff argues that the opinions of Drs. Blasier, Digby and Jamy were not given proper

15

deference by ALJ Jones, and that he further failed to provide sufficient reasons for his inconsistent finding. This theory is based upon Plaintiff's contention that records from each doctor support her allegation that she cannot lift more than 5 pounds.

Dr. Jamy was the doctor that signed the *Personnel Administration - Medical* form from General Motors indicating that Plaintiff had work restrictions until September 9, 2002 (R. 116). In this half page form, the only document in the record from Dr. Jamy and/or General Motors medical, there is no diagnosis or treatment notes. Further, Dr. Jamy indicates that the lifting restriction is based on the recommendation of another doctor, Dr. Carino, from whom there are also no treatment notes in the record. There is no indication that Dr. Jamy was forming a medical opinion rather than completing a form based on another doctor's opinion, and the restrictions ended on September 9, 2002 - 1 year and 8 months prior to the hearing in this matter. Therefore, ALJ Jones opinion is not necessarily in conflict with Dr. Jamy's "opinion", because a reasonable fact finder could determine from this record that the restrictions Dr. Jamy  prescribed were no longer applicable at the time of the hearing because they appear to have been lifted almost two years earlier.

Dr. Digby is the state medical examiner. Plaintiff argues that there is a discrepancy between ALJ Jones' opinion and Dr. Digby's opinion because Dr. Digby noted that Plaintiff's complaint of pain when lifting over 5 pounds was consistent with her allegation of a torn rotator cuff. Taken in isolation, as Plaintiff has done, this statement may appear to lend support to Plaintiff's claim that she cannot lift more than 5 pounds. Yet this argument fails to take into account several facts, not the least of which is the actual details of Dr. Digby's RFC assessment. First, Dr. Blasier, Plaintiff's orthopedic specialist, later confirmed that Plaintiff did not actually have a torn rotator cuff as she had alleged to Dr. Digby (R. 185), and Dr. Digby indicated that Plaintiff's symptoms were credible in light of her

16

allegation of a torn rotator cuff.  It stands to reason that the absence of a torn rotator cuff would at least call into question the credibility of Plaintiff's symptoms, or at least the validity of Dr. Digby's original statement made in reliance on the allegation.  Second, the RFC contemplated by Dr. Digby and ALJ Jones are indeed different, but ALJ Jones' RFC assessment is actually more restrictive.  Dr. Digby found that Plaintiff had the RFC to lift 20 pounds occasionally and 10 pounds frequently (R. 124), while ALJ Jones found that Plaintiff had the RFC to lift 5 pounds frequently and 10 pounds occasionally (R. 21).  ALJ Jones' RFC also had additional restrictions against forceful or sustained gripping, repetitive wrist movement and vibrating hand tools (R. 21).  Further, whereas Dr. Digby's RFC assessment attributed to Plaintiff the ability to frequently crawl and occasionally climb ladders (R. 125), ALJ Jones chose a more restrictive RFC that barred completely any such activity (R. 21).  Last, Dr. Digby's RFC assessment was completed on July 7, 2002 (R. 130), almost two years before the hearing in this matter.  Since that time, not only had an MRI been obtained which revealed the lack of a rotator cuff tear, but Dr. Blasier had reported a complete resolution of Plaintiff's shoulder symptoms after physical therapy (R. 184).  Therefore ALJ Jones had substantial evidence in the record to discount Dr. Digby's RFC assessment and formulate a less restrictive RFC.

Dr. Blasier is Plaintiff's orthopaedic specialist.  Plaintiff argues that ALJ Jones failed to properly consider his opinion in light of his March 11, 2003, statement "I don't see any reason to contemplate changing the restrictions that were given to her by her factory doctor."   Taken in isolation this statement also could lend support to Plaintiff's argument that Dr. Blasier extended the restrictions set forth by Dr. Jamy.  Yet ALJ Jones mentioned the report that contained that statement and went on to cite Dr. Blasier's last report, dated April 28, 2003, wherein he recommended only a home exercise program due to the fact that Plaintiff had achieved "complete resolution" of her

17

shoulder symptoms (R. 184).  Apparently Plaintiff is asking the Court to believe that Dr. Blasier meant for the restrictions to go on indefinitely despite the fact that he did not mention them in his final report and despite the fact that he found her shoulder symptoms to have been completely resolved. Yet there is no evidence of this in Dr. Blasier's final note, which actually indicates that Plaintiff's shoulder is asymptomatic.  Therefore, there is no reason to think that ALJ Jones' opinion is divergent from Dr. Blasier's opinion.          Furthermore, it is the alleged 5 pound weight restriction that Plaintiff says Dr. Blasier prescribed and ALJ Jones ignored, yet she testified that her past work as a general office clerk did not require lifting.  Plaintiff admitted she could lift a gallon of milk without any problem (R. 268) and this Court can take judicial notice that that item weighs approximately 8 pounds.  Therefore, it is unlikely that changing the RFC assessment from restricting lifting to 5 pounds frequently and 10 pounds occasionally to never lifting over 8 pounds would change the fact that Plaintiff is able to perform her past work.

### 3.   *Hypothetical Posed to VE McEachin*

Plaintiff presents a three-fold argument that the hypothetical question posed to VE McEachin failed to take into account all of her impairments.

First, Plaintiff argues that her RFC should have restricted her to a 5 pound weight limit due to the opinions of Drs. Jamy, Digby and Blasier - this argument was discussed and dismissed above.

Second, she argues that ALJ Jones presented a restriction to VE McEachin at the hearing, occasional pushing and pulling with the arms, and then failed to include it in the RFC in his opinion. While this is true, it certainly would not lessen the number of applicable jobs from the pool of available jobs to which VE McEachin testified.  Had the ALJ Jones adopted this restriction, he still could have adopted the VE's response that factored in such an additional restriction on pushing and

pulling.  Thus any error is harmless.

Plaintiff's last argument regarding the hypothetical question is that ALJ Jones failed to account for Plaintiff's mental impairments, which she alleges he found to be severe.  In fact, ALJ Jones did not make a finding that any of Plaintiff's impairments standing alone were severe.  He stated that she had various impairments, including her mental impairments, but found only that they *collectively* met the Regulations' definition of severe (R. 21).  When he discussed the mental impairments individually he found that her anxiety attacks were controlled with medication and therapy and noted that her treators had described her condition as "improved" (R. 21).  He found that she had only mild restrictions in daily living, social functioning and ability to maintain concentration, persistence and pace.  He found that she had no repeated episodes of decompensation lasting for extended periods of time and that the "C" criteria of the Listings were not present.  He found that her psychological symptoms did not significantly effect her ability to perform the mental demands of basic work activities and would not standing alone constitute a severe impairment, and noted that this was reflected in the RFC assessment (R. 21-22).

Plaintiff has not made an argument that she is severely mentally impaired, but instead based her argument that a severe mental impairment should have been included in the hypothetical on the mistaken assumption that ALJ Jones found her mental impairment to be severe.  Yet he makes no such formal finding (R. 23).  Indeed, he specifically determined that the various behavioral consequences of her mental condition were all mild and do not significantly affect her ability to perform the mental demands of basic work activities (R. 21-22).  Plaintiff does not address ALJ Jones' findings regarding the limited role her mental impairment may play in her daily activities, nor the fact that the medical records indicate that her condition was "improved" and  controlled.  In fact, Plaintiff did not include

any indication in her DIB application that she was incapacitated in any way by mental impairments. She checked "no" when asked whether she had sought treatment for a mental or emotional problem limiting her ability to work (R. 73) and she did not provide testimony regarding the mental impairment's effect on her ability to work. Further, in her *Daily Activity* form she indicated that she attended church, visited friends and family, went shopping, went out to eat, visited the sick and counseled young people (R. 96-97). Where the form inquired about difficulty going out in public, Plaintiff indicated "N/A" (R. 100). Further, it is undisputed that Dr. Kim's records indicate that her condition was controlled by medication and therapy. In sum, there is substantial evidence in the record to support ALJ Jones' finding that Plaintiff's mental impairments were not sufficiently severe to compromise her occupational base.

## III.   RECOMMENDATION

For the reasons stated above, IT IS RECOMMENDED that Defendant's Motion for Summary Judgment be GRANTED and Plaintiff's Motion for Summary Judgment be DENIED. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is

to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: January  31, 2006                         s/Steven D. Pepe
Ann Arbor, Michigan                              United States Magistrate Judge

Certificate of Service

I hereby certify that a copy of this Report and Recommendation was served upon the attorneys and/or parties of record by electronic means or U. S. Mail on January 31, 2006.

s/William J. Barkholz
Courtroom Deputy Clerk

21